**Daniel CASTELLANOS–CONTRERAS, et al.**

v.

**DECATUR HOTELS, L.L.C., et al.**

**Civil Action No. 06–4340.**

**United States District Court, E.D. Louisiana.**

May 16, 2007.

LC, New Orleans, LA, James Larry Stine, Wimberly, Lawson, Steckel & Schneider, P.C., Atlanta, GA, Michael L. Fantaci, Le-Blanc Butler, LLC, Metairie, LA, for Decatur Hotels, L.L.C., et al.

## ORDER & REASONS

FALLON, District Judge.

Before the Court are the Defendants' Motion to Dismiss and/or for Summary Judgment (Rec.Doc.51) and the Plaintiffs' Cross Motion for Partial Summary Judgment (Rec.Doc.71). The motions present what appears to be an issue of first impression in the federal courts, namely whether the provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et. seq.*, apply to non-immigrant alien laborers that temporarily enter the United States on "H–2B" visas. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b). The Court heard oral argument and took these motions under submission. For the following reasons, the Court finds that H–2B guestworkers are entitled to the protections of the FLSA. Accordingly, the Defendants' motion to dismiss is now DENIED and the Plaintiffs' cross motion is GRANTED IN PART, insofar as the Court finds that the Plaintiffs are entitled to assert claims under the FLSA. However, the Plaintiffs' motion is DENIED IN PART to the extent that it requests any further relief.

## I. BACKGROUND

On August 16, 2006, Daniel Castellanos–Contreras, Oscar Ricardo Deheza–Ortega, and Rodolfo Antonio Valdez–Baez ("Plaintiffs") filed suit against Decatur Hotels, L.L.C. and F. Patrick Quinn, III, the founder and President/CEO of Decatur Hotels (collectively, "Defendants"). The Plaintiffs are guestworkers recruited from foreign countries following Hurricane Katrina to work in the Defendants' luxury

Tracie L. Washington, Washington Law Firm, New Orleans, LA, Andrew H. Turner, Jennifer Rosenbaum, Mary C. Bauer, Montgomery, AL, Melissa Crow, Washington, DC, for Daniel Castellanos–Contreras, et al.

Leslie Weill Ehret, Ellen Shirer Kovach, Frilot, Partridge, Kohnke & Clements,

hotels in the New Orleans area. Facing a severe reduction in their available work force, the Defendants arranged for the Plaintiffs to temporarily come to the United States on "H–2B" visas. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b). As a part of the application for obtaining certification to bring H–2B guestworkers to New Orleans, the Defendants certified to the U.S. government that qualified persons in the United States were not available to fill the jobs. The Defendants then contracted with the Accent Group, a personnel services company that assisted in recruiting workers from abroad by sub-contracting with local hiring agents. Under the H–2B program, the Plaintiffs' immigration status is tied to their employment with the Defendants; they are prohibited from working for any other employer while in the United States.

In their First Amended Complaint, the Plaintiffs allege that they were enticed to leave their homes in Bolivia, Peru, and the Dominican Republic at significant personal cost to perform guest services, housekeeping, maintenance, and other support functions in the Defendants' hotels based on false promises of high earnings, stable jobs, and good living conditions. Specifically, the Plaintiffs allege that the Defendants violated the FLSA by failing to reimburse them during their first week of employment for travel, visa, recruitment, and other expenses incurred in migrating to the United States. The Plaintiffs allege that such costs ranged from $3,500 to $5,000 per person, and were incurred primarily for the benefit of the Defendants. The Plaintiffs contend that the Defendants' failure to reimburse these costs resulted in a *de facto* deduction from the Plaintiffs' wages such that they earned

substantially less than the $5.15 per hour minimum wage in their first week of employment, in violation of the FLSA. *See* 29 U.S.C. § 206(a).

The Plaintiffs seek a declaration that the Defendants have violated the FLSA, thereby entitling them to awards of unpaid wages and liquidated damages, as well as attorneys' fees and costs. The Plaintiffs also seek to represent an FLSA "opt-in" collective action of all non-supervisory guestworkers employed by the Defendants between August 29, 2005 and August 16, 2006. The Plaintiffs contend that there are approximately three hundred similarly situated H–2B employees; indeed, to date, the Court has received numerous notices from individuals expressing a desire to join the putative collective action. However, the issue of conditional certification of an FLSA collective action is not presently before the Court.[1]

## II. PRESENT MOTIONS

The parties have filed cross motions seeking resolution of a threshold legal issue in this case, namely whether the FLSA applies to non-agricultural guestworkers brought to the United States under the H–2B program. The Plaintiffs contend that the FLSA applies in this case, but go further and ask the Court to find that the Defendants have violated the minimum wage provisions of the FLSA by failing to reimburse the Plaintiffs for visa, travel, and recruitment costs. The Defendants argue that non-agricultural workers employed pursuant to the H–2B program do not enjoy the protections of the FLSA. Alternatively, the Defendants argue that the Plaintiffs are not entitled to reimbursement of the noted costs under the FLSA.

---

1. On December 12, 2006, the Court denied the Plaintiffs' motion for leave to file a Second Amended Complaint, finding that the proposed addition of breach of contract class claims was futile since such claims fell under the scope of the Plaintiffs' putative FLSA collective action. *See* Rec. Doc. 77.

The Court has also received an amicus curiae brief supporting the Defendants' motion to dismiss submitted by several employers that utilize guestworker programs.[2]

## III. LAW & ANALYSIS

### A. Statutory & Regulatory Framework

"[T]hrough the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, Congress has set the basic rules governing whether and under what conditions non-citizens, or 'aliens' to use the term of art, may enter and remain within the United States." *Daylily Farms, Inc. v. Chao,* 357 F.Supp.2d 356, 357 (D.Mass.2005). "United States employers wishing to hire alien workers must navigate a maze of statutory provisions and regulations administered by the Immigration and Naturalization Service and the Department of Labor." *Kooritzky v. Reich,* 17 F.3d 1509, 1510 (D.C.Cir.1994); *see also United States v. Richard Dattner Architects,* 972 F.Supp. 738, 741–42 (S.D.N.Y.1997) (discussing the statutory and regulatory framework). The details of this process are not specifically implicated in the instant case, but it will suffice to say that "[a]n alien seeking to emigrate from a foreign country to the United States may not legally enter without an immigrant visa issued by the United States Consul in his country." *Kooritzky,* 17 F.3d at 1510.

Non-immigrant aliens temporarily entering the United States to work do so on one of several types of visas, depending on the type of work they will be performing. An alien coming to this country to "perform agricultural labor or services" generally enters on what is known as an H–2A visa, named after the statutory section authorizing such entry. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a). The Plaintiffs in this case entered the country on what is known as an H–2B visa, named after the statutory section which authorizes aliens to come "temporarily to the United States to perform . . . temporary service or labor if unemployed persons capable of performing such services or labor cannot be found in this country." *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b). As one court has explained:

> The H2A and H2B programs, created by the [Department of Labor] pursuant to the Immigration Reform and Control Act, contain various hiring requirements with which all employers must comply prior to hiring temporary alien laborers. The practical distinction between the two is that H2A prescribes an employer's treatment of agricultural workers, whereas H2B prescribes the treatment for nonagricultural workers.

*Chao v. N.C. Growers Ass'n,* 280 F.Supp.2d 500, 504 (W.D.N.C.2003).[3]

---

**2.** The amicus brief is submitted by Express Forestry, Inc., Eller and Sons Trees, Inc., and Superior Forestry Service, Inc. These entities are defendants in cases in which similarly situated plaintiffs have made related claims. *See, e.g., Rosiles–Perez v. Superior Forestry Serv., Inc.,* No. 06–0006, 2007 WL 325784 (M.D.Tenn. Jan. 31, 2007); *Leon–Granados v. Eller & Sons Trees, Inc.,* 452 F.Supp.2d 1282 (N.D.Ga.2006); *Recinos–Recinos v. Express Forestry, Inc.,* 233 F.R.D. 472 (E.D.La.2006).

**3.** Non-immigrant aliens may also enter on H–1B visas (specialty occupations, Department of Defense projects, and fashion models), H–1C visas (registered nurses), or H–3 visas (trainees and participants in educational exchange programs). *See* 8 U.S.C. § 1101(a)(15)(H)(i), (iii); 8 C.F.R. § 214.2(h). It has been suggested that the bright-line associations between various visas and types of employment are often blurred in practice. *See, e.g.,* Jacob Wedemeyer, Note, *Of Policies, Procedures, and Packing Sheds: Agricultural Incidents of Employer Abuse of the H–2B Nonagricultural Guestworker Visa,* 10 J. Gender Race & Just. 143, 159 (2006).

"Before a consular officer may issue an H–2B visa, the employer petitioning for the alien's admission must obtain 'certification from the Secretary of Labor stating that qualified workers in the United States are not available and that the alien's employment will not adversely affect wages and working conditions of similarly employed United States workers.'" *United Ass'n of Journeymen v. Barr*, 981 F.2d 1269, 1271–72 (D.C.Cir.1992) (quoting 8 C.F.R. § 214.2(h)(6)(iv)(1)). There is no dispute that the Defendants in this case successfully navigated the statutory and regulatory maze, and that the H–2B visas were properly issued to the Plaintiffs.

## B. H–2A vs. H–2B

The Plaintiffs principally rely on *Arriaga v. Florida Pacific Farms, L.L. C.*, 305 F.3d 1228 (11th Cir.2002), in which the United States Court of Appeals for the Eleventh Circuit held that, under the FLSA, migrant farm workers entering the United States on H–2A visas were entitled to reimbursement of (1) the one-time cost of travel from Mexico to Florida, and (2) the cost associated with obtaining the H–2A visa. The *Arriaga* court began its analysis by noting that "[t]he protections of the minimum wage provisions of the FLSA indisputably apply to the Farmworkers. *See* 20 C.F.R. § 655.103(b) ('During the period for which the temporary alien agricultural labor certification is granted, the employer shall comply with applicable federal, State, and local employment-related laws and regulations ...')." *Id.* at 1235. In light of this clear guidance on the applicability of federal employment law, the court focused its analysis on the provisions of the FLSA and concluded that the plaintiffs were entitled to reimbursement because transportation and visa charges are "an inevitable and inescapable consequence of having foreign H–2A workers employed in the United States." *Id.* at

1242. In the instant case, the Plaintiffs ask the Court to follow *Arriaga* and find that non-immigrant aliens employed pursuant to the H–2B program enjoy the same rights under the FLSA as H–2A workers.

The Defendants, however, argue that distinct statutory and regulatory schemes govern the H–2A and H–2B programs, and that *Arriaga* should not be followed in this case. The Defendants note that there is no counterpart to 20 C.F.R. § 655.103(b) in the H–2B regulations; indeed, the H–2B statutes and regulations do not incorporate other employment-related laws and regulations. Rather, the statutes merely provide that employers who hire H–2B guestworkers must reimburse the reasonable costs of return transportation to aliens who are dismissed before the end of the period of authorized admission. *See* 8 U.S.C. § 1184(c)(5)(A) ("In the case of an alien who is provided nonimmigrant status under section ... 1101(a)(15)(H)(ii)(b) of this title and who is dismissed from employment by the employer before the end of the period of authorized admission, the employer shall be liable for the reasonable costs of return transportation of the alien abroad."). A brief history of the guestworker programs will shed some light on this dispute.

## C. History of the H–2 Guestworker Programs

The original version of the Immigration and Nationality Act made no distinction between those aliens emigrating to the United States to perform agricultural work and those emigrating to perform non-agricultural work. Instead, a distinction was made based on whether or not the work to be performed was considered exceptional:

> The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant

aliens... (H) an alien having a residence in a foreign country which he has no intention of abandoning (i) who is of distinguished merit and ability and who is coming temporarily to the United States to perform temporary services of an *exceptional* nature requiring such merit and ability; or (ii) who is coming temporarily to the United States to perform other temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country....

Pub.L. No. 82–414, § 101(a)(15)(H), 66 Stat. 162, 168 (1952) (emphasis added).

But in subsequent years, Congress began enacting various protections specifically for agricultural laborers. The Farm Labor Contractor Registration Act of 1963 ("FLCRA"), Pub.L. No. 88–582, 78 Stat. 920 (1964) (codified as amended at 7 U.S.C. § § 2041–2055, repealed in 1983), "was the first major federal effort to improve the conditions for agricultural laborers, who are among the most exploited groups in the American labor force because they suffer chronic low wages, long hours and poor working conditions."' *Morante–Navarro v. T & Y Pine Straw, Inc.*, 350 F.3d 1163, 1168 (11th Cir.2003) (citations to legislative history omitted); *see also Bracamontes v. Weyerhaeuser Co.*, 840 F.2d 271, 272 (5th Cir.1988). In 1983, Congress replaced the FLCRA with the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), Pub.L. No. 97–470, 96 Stat. 2583 (1983) (codified at 29 U.S.C. §§ 1801–1900), "to remove the restraints on commerce caused by activities detrimental to migrant and seasonal agricultural workers ... and to assure necessary protections for migrant and seasonal agricultural workers, agricultural associations, and agricultural employers," 29 U.S.C. § 1801. "Congress substituted the AWPA for the FLCRA because the FLCRA had failed to aid exploited agricultural laborers, yet was hampering agricultural employers with its onerous registration requirements." *Morante–Navarro*, 350 F.3d at 1169.

Then, in 1986, Congress amended subsection (H)(ii) of the Immigration and Nationality Act to distinguish those who come to the United States "to perform agricultural labor or services" from those who come "to perform other temporary service or labor." *See* Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. No. 99–603, § 301(a), 100 Stat. 3359, 3411 (codified at 8 U.S.C. § 1101(a)(15)(H)(ii)); *see also AFL–CIO v. Brock*, 835 F.2d 912, 913 (D.C.Cir.1987). The IRCA set forth detailed conditions for approval of H–2A petitions. *See* IRCA § 301(c), 100 Stat. at 3411–17 (codified as amended at 8 U.S.C. § 1188).[4] The legislative history accompa-

4. These modifications to the H–2 program were but one part of the IRCA, as explained by the United States Supreme Court:

> [The IRCA] constituted a major statutory response to the vast tide of illegal immigration that had produced a 'shadow population' of literally millions of undocumented aliens in the United States. On the one hand, Congress sought to stem the tide by making the plight of the undocumented alien even more onerous in the future than it had been in the past; thus, the Reform Act imposed criminal sanctions on employers who hired undocumented workers and made a number of federally funded welfare benefits unavailable to these aliens. On the other hand, in recognition that a large segment of the shadow population played a useful and constructive role in the American economy, but continued to reside in perpetual fear, the Reform Act established two broad amnesty programs to allow existing undocumented aliens to emerge from the shadows.

*McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 481, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991) (footnotes omitted).

nying the IRCA provides context for these changes:

> The H–2 program, in one form or another, has been an element of U.S. immigration policy since the 1940's. The essential objective of the program, which the bill does not change, is to permit employers to utilize temporary foreign workers if domestic workers cannot be found and if it can be shown that the use of such foreign labor would not adversely affect the wages and working conditions of domestic workers similarly employed. Overall, the program has worked reasonably well with respect to non-agricultural occupations. However, with respect to agriculture, the Committee has identified a number of areas where improvement is needed. Accordingly, the bill creates a separate H–2 program for agricultural occupations and sets forth the basic contours that program is expected to take. The bill makes no changes regarding the non-agricultural H–2 law.

H.R.Rep. No. 99–682, at 50–51, *as reprinted in* 1986 U.S.C.C.A.N. 5649, 5654 (1986). The report noted that "agricultural employers and employers involved in the hotel and restaurant business" relied on the H–2 program, but expressed the following concerns:

> Detailed regulations governing the program have been issued by the Employment and Training Administration in the Department of Labor (See 20 CFR Part 655) and the Immigration and Naturalization Service in the Department of Justice (See 8 CFR 214.2(h)(3)). In the Committee's view, these regulations do not fully meet the need for an efficient, workable, and coherent program that protects the interests of agricultural employers and workers alike. Recognizing the unique needs of growers and the inadequacy of current protections for farmworkers, the bill creates a separate

and distinct H–2 program for agriculture, referred to in the bill as the 'H–2A' program. Nonagricultural employers wishing to import temporary workers will utilize the H–2B program. The bill makes no changes to the statutory language concerning non-agricultural H–2's; instead it divides the program into two parts and sets forth a number of specific requirements regarding the operation of the H–2A program.

*Id.* at 80, as *reprinted* in 1986 U.S.C.C.A.N. 5649, 5684.

### D. The FLSA Applies to H–2B Guestworkers

█ While the historical development and fragmentation of the H–2 program clearly demonstrates Congress's special concern for agricultural laborers, it does not suggest that nonagricultural laborers are to be divested of any legal rights they may otherwise enjoy. The fact that the H–2B statutes and regulations do not expressly recognize the applicability of the FLSA is not determinative of the issue before the Court. Indeed, neither Congress nor the relevant federal agencies have ever stated that H–2B guestworkers are not entitled to the protections of the FLSA. Although neither of the parties, nor the Court's own research, have turned up a single case finding that the FLSA applies to H–2B workers, one court may have implicitly resolved this threshold issue by reaching the question of conditional certification in an H–2B case. *See Lemus Guerrero v. Brickman Group, LLC,* No. 05–357, 2007 WL 922420 (W.D.Mich. Mar. 26, 2007). The only other court to discuss the issue noted in dicta that it had reservations about applying the FLSA in the absence of an "authoritative case extending the *Arriaga* holding to H–2B workers;" however, the court did not engage in any significant analysis because it found conditional certification inappropriate for other reasons. *See Villanueva–Bazaldua v.*

*TruGreen Ltd. Partners,* 479 F.Supp.2d 411, 417–18 (D.Del.2007).

■ By its own terms, the FLSA applies to all "employees," that is, to "any individual employed by an employer." 29 U.S.C. § 203(e). As the United States Court of Appeals for the Fifth Circuit has held, "it is well established that the protections of the Fair Labor Standards Act are applicable to citizens and aliens alike and whether the alien is documented or undocumented is irrelevant." *In re Reyes,* 814 F.2d 168, 170 (5th Cir.1987), *cert. denied* 487 U.S. 1235, 108 S.Ct. 2901, 101 L.Ed.2d 934 (1988); *see also Patel v. Quality Inn South,* 846 F.2d 700, 702 (11th Cir.1988) ("Congress defined the term 'employee' for the purpose of determining who would be covered by the act. It would be difficult to draft a more expansive definition."); *Contreras v. Corinthian Vigor Ins. Brokerage, Inc.,* 25 F.Supp.2d 1053, 1056 (N.D.Cal.1998). If undocumented workers are entitled to the protections of the FLSA, the Court sees no rational reason to preclude documented H–2B guestworkers from asserting the same rights under the Act. Indeed, while the FLSA specifically exempts several classes of employees from its coverage, "none of these exemptions concerns immigration status." *Patel,* 846 F.2d at 702 n. 2. This "specificity in stating exemptions strengthens the implication that employees not thus exempted," such as H–2B guestworkers, "remain within the Act." *Powell v. U.S. Cartridge Co.,* 339 U.S. 497, 517, 70 S.Ct. 755, 94 L.Ed.

1017 (1950). Accordingly, the Court finds that the Plaintiffs in this case are entitled to the protections of the FLSA.[5]

## IV. CONCLUSION

For the foregoing reasons, IT IS ORDERED that the Defendants' Motion to Dismiss and/or for Summary Judgment (Rec.Doc.51) is DENIED and that the Plaintiffs' Motion for Partial Summary Judgment (Rec.Doc.71) is GRANTED IN PART, insofar as the Court finds that the Plaintiffs are entitled to assert claims under the Fair Labor Standards Act. However, IT IS FURTHER ORDERED that the Plaintiffs' motion is DENIED IN PART to the extent that it requests any further relief.

---

5. However, whether or not the Defendants have violated the FLSA is a factual issue that is not appropriate for summary judgment. The Court takes the opportunity, though, to note that in light of its conclusion that the FLSA applies in the H–2B context, *Arriaga* and its progeny of H–2A cases become extremely persuasive precedent. *See Arriaga,* 305 F.3d at 1242 (holding that travel and visa costs are incurred by guestworkers "for the primary benefit and convenience of their employer" and thus are not "other facilities"

that can be counted as wage credits pursuant to 29 U.S.C. § 203(m)); *see also De Luna–Guerrero v. N.C. Grower's Ass'n,* 338 F.Supp.2d 649 (E.D.N.C.2004) (following *Arriaga*). While factual issues exist with respect to (1) the specific amounts paid by the Plaintiffs prior to coming to the United States and (2) the exact wages they ultimately earned working for the Defendants, the legal framework for determining whether the minimum wage provisions of the FLSA have been violated appears to be well-settled.